**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

VETERINARY ORTHOPEDIC
IMPLANTS, INC.,

        Plaintiff,

                                     Case No. 3:20-cv-868-J-34MCR

vs.

MATTHEW J. HAAS,

        Defendant.

_____/

# O R D E R

    **THIS CAUSE** is before the Court on Plaintiff's Motion for Temporary Restraining Order and for Preliminary Injunction (Doc. 7; Motion), filed simultaneously with a Memorandum in Support of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 8; Memo) on August 11, 2020.  Plaintiff Veterinary Orthopedic Implants, Inc. (VOI) initiated this action on August 3, 2020, see Complaint (Doc. 1), and filed an Amended Complaint for Injunctive Relief and Damages (Doc. 3; Am. Compl.) on August 5, 2020, which is the operative pleading.  This lawsuit arises out of allegations that VOI's former employee, Defendant Matthew J. Haas, has recently begun working for one of VOI's direct competitors, Arthrex, Inc. dba Arthrex Vet Systems (Arthrex), in violation of a non-competition agreement between VOI and Haas.  See Am. Compl. ¶¶ 16-25, 52.  The Court held a status conference on August 14, 2020, at which counsel for both parties appeared via Zoom.  See Minute Entry (Doc. 15; Status Conference).  At the Status Conference, the Court denied VOI's request for a temporary restraining order without prejudice pursuant to the agreement of the parties, and set a briefing schedule on the

request for preliminary injunctive relief.  Id.  In accordance with the Court's schedule, Haas filed his response to the Motion on August 18, 2020, and on August 21, 2020, VOI submitted its reply.  See Opposition to Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 18; Response); Reply in Support of Plaintiff's Motion for Preliminary Injunction (Doc. 21; Reply).  The Court held a hearing on the Motion on August 26, 2020, at which all parties appeared via Zoom videoconference.  See Minute Entry (Doc. 23; Hearing).  Accordingly, VOI's request for preliminary injunctive relief is now ripe for review.

## I.   Preliminary Injunction Standard

Generally, a preliminary injunction is an extraordinary and drastic remedy.  See McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998); see also Davidoff & CIE, S.A. v. PLD Int'l Corp., 263 F.3d 1297, 1300 (11th Cir. 2001).  Indeed, "[a] preliminary injunction is a powerful exercise of judicial authority in advance of trial."  Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla., 896 F.2d 1283, 1284 (11th Cir. 1990).  Thus, in order to grant a request for preliminary injunctive relief, the movant bears the burden to clearly establish the following: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction were not granted, (3) that the threatened injury to the [movant] outweighs the harm an injunction may cause the [opposing party], and (4) that granting the injunction would not disserve the public interest."  Am. Red Cross v. Palm Beach Blood Bank, Inc., 143 F.3d 1407, 1410 (11th Cir. 1998); see also Davidoff & CIE, S.A., 263 F.3d at 1300; McDonald's Corp., 147 F.3d at 1306; Ne. Fla., 896 F.2d at 1284-85.  The movant, at all times, bears the burden of persuasion as to each of these four requirements.  See Ne. Fla.,

896 F.2d at 1285.  And the failure to establish an element, such as a substantial likelihood of success on the merits, will warrant denial of the request for preliminary injunctive relief and obviate the need to discuss the remaining elements.[1]  See Pittman v. Cole, 267 F.3d 1269, 1292 (11th Cir. 2001) (citing Church v. City of Huntsville, 30 F.3d 1332, 1342 (11th Cir. 1994)); Del Monte Fresh Produce Co. v. Dole Food Co., 148 F. Supp. 2d 1326, 1339 n.7 (S.D. Fla. 2001).

When, as in this case, the party moving for a preliminary injunction is doing so on the basis of a state law violation (e.g., the violation of a state law covenant-not-to-compete), general Erie principles apply.  Accordingly, state law will guide substantive matters (e.g., has a valid state law covenant-not-to-compete been violated), while federal law will address procedural matters (e.g., the issuance of a preliminary injunction).  See TransUnion Risk & Alternative Data Solutions, Inc. v. MacLachlan, 625 F. App'x 403, 406 (11th Cir. 2015); Ferrero v. Assoc. Materials Inc., 923 F.2d 1441, 1448-49 (11th Cir. 1991).  In addition, "where facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue," the Eleventh Circuit instructs that "an evidentiary hearing must be held."  See McDonald's Corp. v. Robertson, 147 F.3d 1301, 1312 (11th Cir. 1998).  However, "where material facts are not in dispute, or where facts in dispute are not material to the preliminary injunction sought, district courts generally need not hold an evidentiary hearing."  Id. at 1313.  In between these extremes are cases where "'there is little dispute as to raw facts but much as to the inferences to be drawn from them.'"  Id. (quoting Jackson v. Fair, 846 F.2d 811, 819 (1st Cir.1988)).  In such circumstances, district

---

[1] Similarly, where a plaintiff fails to establish irreparable harm, the court need not address each element of a claim for preliminary injunctive relief.  See Ne. Fla., 896 F.2d at 1285 (noting that "[a] showing of irreparable harm is the sine qua non of injunctive relief" and reversing the grant of such relief absent irreparable harm).

courts must exercise their discretion in determining whether an evidentiary hearing is necessary, "'balancing between speed and practicality versus accuracy and fairness.'" <u>Id.</u> (quoting <u>Jackson</u>, 846 F.2d at 819).

## II.     Factual Background

Prior to setting forth the factual background of this case, the Court observes that, as discussed at the Hearing, there are a number of disputed factual issues on the record currently before the Court.  However, despite the competing affidavits, neither party requested or asserted the need for an evidentiary hearing.  Upon careful consideration of the record, the Court will exercise its discretion to resolve the instant Motion without conducting an evidentiary hearing because, after setting aside those matters that are in dispute, VOI has nevertheless established a substantial likelihood of success on the merits. As will be discussed, to enforce a restrictive covenant under Florida law, a business must show that it has a legitimate business interest justifying the restriction, which includes, as relevant here, confidential business information.  <u>See</u> Fla. Stat. § 542.335(1)(b)(2.).  While the parties dispute whether much of VOI's alleged confidential business information is in fact confidential and the degree to which Haas was exposed to such information, VOI need only establish the existence of one legitimate business interest to justify the enforcement of its restrictive covenant.  For the reasons set forth in this Order, the Court finds that VOI has met that burden here.  As such, the Court need not address those alleged legitimate business interests which the Court finds to be subject to material dispute or otherwise not

adequately supported on the current record, and limits its recitation of the facts accordingly.[2]

According to Patrick Gendreau, VOI's President and CEO,  VOI "makes, distributes, markets and sells" veterinary orthopedic products, such as "surgical screws, surgical plates, surgical appliances, and surgical instruments and tools."  See Motion, Ex. 1: Affidavit of Patrick Gendreau (Doc. 7-1; Gendreau Aff.) ¶¶ 4-5.  Gendreau explains that in this industry "most of the large customers making purchasing decisions that result in the bulk of a seller's revenue are found in institutions," such as university-based veterinary medical centers, veterinary clinics associated with zoos or wildlife parks, or specialized private veterinary practice groups in large metropolitan areas.  Id. ¶ 6.  According to Gendreau, customers in this industry are "situated to be repeat buyers."  Id. ¶ 7.  Because of these dynamics, "the decision-making leaders of these larger organizations [are] the most prized customers in VOI's industry," id. ¶ 8, and VOI has spent over two decades, "many thousands of paid employee hours and multiple millions of dollars" developing ways to create products and communicate about those products to these "Key Opinion Leaders." Id. ¶ 9.  VOI has also developed "through years of hard work and expense," a referral network of "customers and industry allies, professionals in the veterinary orthopedic industry who, because they make the choice to prefer or follow VOI's goodwill, also make the choice to refer new prospective customers to VOI, and to connect VOI to new prospects through networking."  Id. ¶ 15.  According to Gendreau, "[t]he value of VOI's current

---

[2] The Court notes that, as the Motion is one for preliminary injunctive relief and is necessarily before the Court on an expedited schedule, the factual record recited in this Order is not completely developed. Therefore, even those facts which are uncontroverted at this time do not necessarily reflect what may be established on a more fully developed record following trial on these issues.  Accordingly, the determinations in this Order are expressly limited to the record before the Court at this time and should not be interpreted as a final decision on the merits.

customers and current referral sources is vast; as to what they mean to VOI's future revenue growth and profits, they are nearly incalculable." Id. ¶ 16.

VOI is not only a seller of veterinary orthopedic products, it also designs these products, and in doing so generates "goodwill in the form of the opportunity to communicate to prospective customers at a level of fine detail regarding how VOI products are made, how they perform, how they were developed or have been improved, and how they can fill a need a customer has or provide a solution a customer needs." Id. ¶ 10. In addition, VOI "augments its creation of its products with a great deal of proprietary information and education materials . . . ." Id. ¶¶ 11-12. VOI business development and sales executives travel throughout the United States and internationally to deliver these "original, proprietary modules of information and education" to current and prospective customers, as well as Key Opinion Leaders. Id. ¶ 13. Gendreau states that VOI's approach—its innovative product development combined with its innovative product education and communication—has resulted in "high and growing levels of sales revenue." Id. ¶ 14.

Gendreau maintains that VOI is "very careful to keep the following business information confidential, and away from public knowledge or public discourse":

a. The identities of VOI's customers, and their contact information;
b. The identities of VOI's referral sources, and their contact information;
c. The identities of those persons in the industry VOI identifies as Key Opinion Leaders;
d. The identities of VOI manufacturing and distribution partners and vendors;
e. VOI's information and educational modules auxiliary to its products;
f. The processes and methods VOI uses to create those modules;
g. The patterns of customer preference and need that underpin the design of those processes and methods;
h. Specific customer purchasing information;
i. Prices and payment terms;
j. VOI's costs and margins; and
k. Marketing and sales strategy

6

See Gendreau Aff. ¶ 17.  In order to maintain the secrecy of this information, VOI takes the following measures: 1) requiring employees to sign non-disclosure, confidentiality, non-solicitation, and non-competition agreements, 2) storing the information in confined computer and physical storage systems when not in use for operational purposes, 3) limiting its dissemination to only those employees who need it to perform their jobs, and 4) communicating formally and informally to employees the importance of not disclosing this information to the public.  Id. ¶ 18.  Gendreau states that keeping this information secret allows it to "stay competitive in the competitive industry of veterinary orthopedic products," and that this information "is not ascertainable from public sources" and would "be difficult to duplicate, even for a seasoned competing business."  Id. ¶¶ 19-21.  Moreover, according to Gendreau, if such information was given to a competitor, the competitor "could competitively change their product line, price structure, or marketing approach in a way designed to take sales away from VOI," and "neutralize VOI goodwill under the guise of simply offering a prospect their company's changed or new product."  Id. ¶ 22.

Defendant Matthew J. Haas worked at VOI for five years—from approximately February 6, 2015, until March 30, 2020, selling "various orthopedic veterinary products to veterinarians."  See Response, Ex. 2: Declaration of Matthew J. Haas (Haas Decl.) ¶ 4; Gendreau Aff. ¶¶ 23, 27; see also Am. Compl., Ex. A: Employment Agreement ¶ I.F.; id., Ex. C: Separation Agreement and General Release ¶ 1.  Prior to his termination, Haas was a "Senior Business Development Manager," and had recently relocated to work at VOI headquarters in St. Augustine, Florida to pursue advancement within the company.  See Haas Decl. ¶¶ 4, 27-28; Reply, Ex. 1: Declaration of Patrick Gendreau (Gendreau Decl.) ¶¶ 17-20.  Before working at VOI, Haas "had been employed in sales and marketing

positions for nearly ten years, including almost five years in the medical and veterinary space." <u>See</u> Haas Decl. ¶ 5.

Significantly, at the outset of his employment with VOI, on February 6, 2015, Haas executed an Employment Agreement in which he agreed to certain "Post-Employment Restrictions." <u>See</u> Gendreau Aff. ¶ 23; Employment Agreement ¶ V.  Pursuant to his Employment Agreement, Haas agreed that for twenty-four months following the termination of his employment, regardless of the reason for his termination, Haas would not:

1. Solicit [VOI] Clients . . .

3. Disclose Confidential Business Information[3] to persons not affiliated with [VOI], including, without limitation, [VOI] Competitors . . . or use such information in any way, for any reason or purpose whatsoever, that will be in any manner in competition with or detrimental to the interests of [VOI], or solicit any of [VOI's] business, [VOI] Clients and/or employees;

---

3 The Employment Agreement defines Confidential Business Information to include any and all: (i) trade secrets concerning the business and affairs of the Company, product specifications, data, know-how, formulae, compositions, processes, designs, sketches, recipes, photographs, graphs, drawings, samples, inventions and ideas, past, current, and planned research and development, current and planned production, preparation and distribution methods and processes, customer lists, current and anticipated customer requirements, price lists, market studies, business plans, and any other information, however documented, that is a trade secret within the meaning of any applicable state or federal law that defines trade secrets; (ii) information concerning the business and affairs of the Company (which includes but is not limited to historical financial statements, financial projections and budgets, historical and projected sales, capital spending budgets and plans, the names and backgrounds of key personnel, personnel training techniques and materials), however documented, that has been or may hereafter be provided or shown to the Employee by the Company or by the directors, officers, employees, agents, consultants, advisors, or other representatives including legal counsel, accountants and financial advisors ("Representatives") of the Company (the "Company Representatives") or is otherwise obtained from review of Company documents or property or discussions with Company Representatives by the Employee or the Employee's Representatives irrespective of the form of the communication, and also includes all notes, analyses, compilations, studies, summaries, and other material prepared by the Employee or the Employee's Representatives containing or based, in whole or in part, on any information included in the foregoing; (iii) other confidential or proprietary information that the Company has developed or maintained or may develop or maintain, including, without limitation, client names and addresses, client agreements or contracts (including the terms and conditions thereof), special requirements of clients, Company financial reports, and Company business plans and strategies, and (iv) any information which the Company has made or may make reasonable efforts to maintain the secrecy thereof. <u>See</u> Employment Agreement ¶ I.B.

4. Engage in any business or activity, within the continental United States or in the international market, or in any business or activity related to veterinary orthopedic implants in which (a) [VOI] is engaged at the Termination Date; (b) [VOI] was engaged at any time during the twenty-four (24) months prior to the Termination Date; or (C) [VOI] is exploring entering into as of the Termination Date.

5. . . . [B]e employed by . . . any entity that in any way competes with [VOI] . . . ;

7. Do any of the following: (a) compete against [VOI]; (b) carry on or engage in a business similar to [VOI's] business . . . (e) . . . be employed by . . . any business engaged in the business of supplying, manufacturing, distributing or selling orthopedic implants for animals, or any other business similar to the business then engaged in by [VOI] . . . .

See Employment Agreement ¶¶ V.A.1.–7.  The Employment Agreement further states that VOI's "business includes customers/clients located throughout the United States and in the international market," such that "the geographic scope of the covenants not to compete shall extend worldwide." Id. ¶ V.B.  In the Employment Agreement, Haas agreed that these restraints "are reasonable as to time and geographic limitation," id., and that "enforcement of the restriction contained in this Agreement will not deprive [him] of his ability to earn a reasonable living," id. ¶ V.D.  Exhibit B to the Employment Agreement is titled "Employee Non-Compete Agreement" and provides in pertinent part that Haas "shall not . . . be employed in a business substantially similar to, or competitive with, the present business of VOI Inc. or such other business activity in which VOI Inc. may substantially engage during the term of employment" for a period of two years commencing on the date of termination.  Id., Ex. B.  Haas separately executed this Exhibit to his Employment Agreement on February 6, 2015, id., and re-executed the "Employee Non-Compete Agreement" portion of his Employment Agreement on March 18, 2017, see Am. Compl., Ex. B.

9

According to Haas, in his last two years working at VOI, he did not serve a particular territory, but rather, made the majority of his sales at trade shows and workshops that VOI hosted.  See Haas Decl. ¶¶ 8-9.[4]  VOI does not appear to contest this characterization of Haas' employment.  See Gendreau Decl. ¶ 11 (stating that Haas "developed significant experience in selling nationally through trade shows while at VOI for 5 years").  At trade shows, veterinarians attend various presentations and, if interested in the products presented, seek out the booth for the company selling that product.  See Haas Decl. ¶ 10.  In addition, VOI hosted workshops or "labs," typically in Las Vegas, which doctors from across the country would pay to attend.  Id. ¶ 11.  These workshops included a mix of demonstrations and lectures educating doctors on new techniques and providing continuing education credits.  Id.  Although ostensibly educational, Haas maintains that he made approximately 80% of his sales at such labs because "doctors would learn about the new techniques and ask what products [VOI] sells that can support that technique."  Id. ¶ 12.  Haas primarily worked at "Tibial Plateau Leveling Osteotomy (TPLO) and fracture repair labs."  Id. ¶ 13.

According to Gendreau, Haas' role at VOI included meeting and communicating with "many, if not most, of VOI's major and repeat customers," and Haas was "charged with communicating to and cultivating commercial relations between VOI and Key Opinion Leaders."  Id. ¶¶ 28, 30.  Gendreau explains that Haas was "exposed to, and worked with, virtually every aspect of VOI's confidential business information," and "had access to VOI's entire customer base . . . ."  See Gendreau Aff. ¶ 29.  Gendreau describes Haas as "one of the VOI employees tasked with developing new customers, and states that VOI armed

_____

[4] However, Haas does acknowledge that he spent "a larger portion of [his] time focused on growing" Australia such that Australia was part of his "territory" to the extent he had one.  See Haas Decl. ¶ 9.

him with the product, strategy, and educational module information that grounded VOI's success in converting prospects to customers." Id.  Gendreau avers that Haas received "extensive VOI training on VOI products," and was "entrusted with VOI strategy, and with VOI's commercial data and information on prices, terms, and purchasing preferences and patterns of customers." Id. ¶¶ 31-32.  Gendreau maintains that Haas also attended "closed monthly sales team meetings," where he was exposed to "the proprietary strategies and market analyses of VOI as a commercial organization selling original products through proprietary means," as well as "data and telemetries providing feedback and what was working, what was driving sales." Id. ¶ 33.

However, according to Haas, VOI's products are "cheaper replicas" of competitors' products such that, unable to compete on the quality of the product, Haas would emphasize the "price advantage." See Haas Decl. ¶¶ 15-19.  "Because of this model, [Haas] was paid a flat salary, rather than a commission-based compensation structure that would reward [him] for a specific sale or creating a relationship between [Haas] and a doctor or referral source." Id. ¶ 20.[5]  Haas maintains that he "did not engage in any day-to-day oversight of purchasing or ongoing sales," which was handled by a separate "inside sales" group at VOI, and therefore "did not have reason to have any knowledge as to the specific price a product sold to a particular customer, nor the margins related to those products." Id. ¶¶ 21-22.  Indeed, Haas asserts that he "was not privy to specific [VOI] margins or costs" and that "even if he had access to such information" he has no use for it in his role at Arthrex because Arthrex, as a higher-end product, does not compete with VOI on price. Id. ¶ 43.

---

[5] While Haas may not have been paid commissions, VOI presents evidence that he did receive "discrete bonuses via direct deposit on January 9, 2019, April 17, 2019, July 24, 2019, December 24, 2019, and January 22, 2020." See Reply, Ex. 3: Declaration of Kristine Thornton (Doc. 21-3; Thornton Decl.) ¶ 10.

Regardless, the evidence before the Court shows that Haas did at least have access to such information through VOI's "sales database named Fishbowl," which contains "VOI's proprietary cost and margin data," as well as "proprietary past sales records, invoice copies, and customer contact information." See Gendreau Decl. ¶¶ 13-14. According to Gendreau, Haas had a Fishbowl user ID and password, such that he had access to "granular knowledge of specific prices and margins tied to specific sales to specific customers." Id. ¶ 14.

Haas also contends that he "was not privy to any product development or product enhancement information" and does not know what VOI "is currently developing or enhancing." See Haas Decl. ¶ 44. In addition, Haas states that he "was not privy to market strategy information," and does not know what VOI's strategy is, other than "to sell products at low prices, often with discounts." Id. ¶ 45. He also does not recall being at any monthly sales meetings where such confidential information was discussed, but "if it was," he did not take that information with him. Id. ¶ 46. According to VOI's President of Business Development, Tim VanHorssen, Haas attended monthly sales meetings where "customers, sales, pricing, product developments, [and] marketing initiatives" were discussed. See Reply, Ex. 2: Declaration of Tim VanHorssen (VanHorssen Decl.) ¶ 9. VanHorssen maintains that these topics encompass "proprietary VOI business information that VOI developed, or, in the case of customers, invested and paid for to obtain and refine." Id. Gendreau also maintains that Haas "actively worked" with "VOI's market strategy elements," including "educational content," "product purchase incentives," "in-house financing incentives," and "targeted relationship-building with Key Opinion Leaders and veterinary orthopedic researchers." See Gendreau Decl. ¶ 15. At the very least, Haas

appears to be familiar with VOI's strategy of targeting Key Opinion Leaders.  Indeed, in his Declaration, Haas explains that Key Opinion Leaders are "leaders in the industry" and not specific to VOI.  See Haas Decl. ¶ 36.  Haas offers an example of a doctor at the University of Florida who VOI has designated as a Key Opinion Leader.  According to Haas, this doctor purchases most of his products from other manufacturers, and teaches at labs for VOI while also serving as a consultant for Arthrex. Id. ¶ 36.

VOI fired Haas on March 30, 2020.  See id. ¶¶ 27-29; Gendreau Decl. ¶¶ 17-20.  According to VOI, Haas was placed on a "probationary performance improvement plan" in early March, and then subsequently terminated.  See Gendreau Decl. ¶¶ 16, 20; see also Reply, Ex. 3: Declaration of Kristine Thornton (Thornton Decl.) ¶¶ 6-7.  In connection with his termination, Haas executed a Separation Agreement and Release on April 17, 2020, in which he accepted a payment of $21,029.17, in exchange for releasing VOI from "any and all claims or causes of action he may have or claim to have," including those related in any way to his employment or termination.  See Am. Compl., Ex. C: Separation Agreement and Release ¶¶ 2-3.  The Separation Agreement also provides that it:

> sets forth the entire understanding and agreement between the Parties and, except as set forth in the first sentence of Paragraph 6 of this Agreement, fully supersedes any and all prior contracts or agreements between the Parties pertaining to compensate nor severance, and it likewise fully supersedes any and all other conflicting agreement or understandings between the Parties.

See id. ¶ 16.

Significantly, in paragraph 6, Haas agreed that "the Confidentiality, nondisclosure, non-compete, and non-solicitation portion of any agreements made in regards to [VOI] that impose confidentiality, nondisclosure, non-competition, non-solicitation portions of the

employment agreements [sic] upon him shall remain in force." Id. ¶ 6.  The Separation

Agreement further states that:

> From and after [March 30, 2020], [Haas] agrees not to divulge or use to the detriment of [VOI], his benefit, or the benefit of any other person, any proprietary or confidential information or trade secrets related to [VOI] including, without limitation, [VOI's] trade secrets or other intellectual property rights, personnel information, know-how, customer lists, pricing information or other confidential or proprietary data, including information acquired in connection with his employment by [VOI].

Id.  Haas also agreed to return all VOI materials and property to VOI.  Id. ¶¶ 6-7.

On July 6, 2020, Haas began working for Arthrex.  See Response, Ex. 1: Declaration

of Drew Maddalone (Maddalone Decl.) ¶ 36.  According to Haas, "he relied on the goodwill

of veterinarians that [he] had known for years to support [him] in getting another opportunity

with [Arthrex]."  See Haas Decl. ¶ 69.  Although Haas maintains that he did not have any

contact with Arthrex prior to his termination, Drew Maddalone, the National Business

Manager for Arthrex Vet Systems states that he learned of Haas in "March 2020, when a

doctor from the University of Florida emailed me to say that he had worked with a good

person who was recently terminated by VOI and may be a good fit for [Arthrex]."  See Haas

Decl. ¶ 47; Maddalone Decl. ¶ 32.  Maddalone received another recommendation on behalf

of Haas from a doctor at Ohio State University.  See Maddalone Decl. ¶ 33.  Maddalone

then contacted Haas about working for Arthrex.  Id. ¶ 34.  In June of 2020, Maddalone

circulated a memo to the Human Resources Department at Arthrex referencing an offer of

employment to Haas, acknowledging his non-compete agreement with VOI, and confirming

that Haas would not be asked to breach that agreement.  See id. ¶ 35, Ex. B.  Haas

maintains that after VOI fired him he applied for "over twenty employment positions outside

of the veterinary industry," and received no interview offers.  See Haas Decl. ¶ 70.  Haas

maintains that he only accepted the position with Arthrex after VOI was acquired by another company in May 2020 and had failed to pay Haas a $100,000 buy-out payment that he asserts is due to him under the Employment Agreement.  See Haas Decl. ¶¶ 64-68; Employment Agreement ¶ XI; Response at 5 n.1 (linking to news article reporting VOI's acquisition).

According to Gendreau, Arthrex is a "direct competitor of VOI, and strives to manufacture, distribute, and sell products to the veterinary orthopedic industry that directly compete with VOI products."  See Gendreau Aff. ¶ 36.  However, Arthrex's main sales line is in arthroscopy products, which VOI does not sell.  See Haas Decl. ¶ 32; Maddalone ¶ 29.  Arthrex also sells equine and biologics products, which are not sold by VOI.  See Maddalone ¶ 29.  Nevertheless, both companies do sell TPLO products, which was one of Haas' main product lines at VOI, and as the second highest revenue category for Arthrex accounts for approximately 20% of its sales.  See Maddalone Decl. ¶¶ 12, 13; Haas Decl. ¶ 13.[6]  The companies appear to sell overlapping products in other veterinary surgical categories as well.  See Gendreau Decl. ¶ 6; Maddalone Decl. ¶ 13 (stating that TPLO is the "only area of product overlap" but acknowledging that this is "with some exception").  Nonetheless, Haas asserts that the companies are not in competition because Arthrex products are high-quality and thus attractive to "high-end veterinary surgeons."  See Maddalone Decl. ¶¶ 20-23; Haas Decl. ¶ 56; see also Maddalone Decl. ¶ 20 ("[Arthrex] does not view [VOI] as competitor.").  For his part, Maddalone describes VOI as a "low-

---

[6] Haas' other main product line at VOI was fracture repair products.  See Haas Decl. ¶ 13, 53.  Maddalone and Haas state that Arthrex does not sell such products, see Maddalone ¶ 30; Haas ¶ 53, while VOI maintains that Arthrex does sell fracture repair products and provides a link to an Arthrex website where screws used for the surgical fixation of fractures are advertised.  See Gendreau Decl. ¶ 6; see also Reply at 4 n.3.

cost manufacturer and distributor," who sells to "cost-conscious" surgeons.   See Maddalone Decl. ¶¶ 18, 24; Haas Decl. ¶ 56.   As is no surprise, VOI disputes this characterization of its company and maintains that its products are made of the same "implant-grade material" that competitors such as Arthrex use, and states that "finding cost-savings and making our products more price-competitive is business innovation, and one that does not compromise our products' quality."   See Gendreau Decl. ¶ 8.   According to Gendreau, VOI "actively sells products to over forty (40) veterinary teaching hospitals around the world," and while other well-known companies may capture "more of the older, longer-tenured veterinarians," VOI has "successfully built a renewing customer base among newer, up and coming veterinarians."   Id. ¶¶ 4-5.

In describing his employment with Arthrex, Haas states that he has "made no effort to solicit any veterinarians or referral sources that purchased similar products from [VOI]," and he has "only solicited business from existing [Arthrex] customers and [has] not solicited sales from any veterinarian or referral source that [he] worked with while employed by [VOI]."   See Haas Decl. ¶¶ 57-58; see also Maddalone Decl. ¶ 39 (stating that Haas has only called on and serviced existing Arthrex accounts in his territory, and "has not solicited customers that are exclusive to [VOI], to the extent any exist").   Haas also maintains, and there is no evidence to suggest otherwise, that when he left VOI he did not take with him any "customer lists or referral source information," "distributor or vendor data," "information or educational modules," "purchasing data," "pricing or payment term data," "market strategy information," or any information from monthly sales meetings.   See Haas Decl. ¶¶ 33, 37, 38, 40, 41, 45, 46.   Nevertheless, Gendreau maintains that Haas "carries in his head the 'keys to the VOI sales kingdom' and his very presence at a competitor such as

16

Arthrex immediately threatens the value and sustainability of VOI goodwill and proprietary innovations, systems, processes, information, and strategy." See Gendreau Aff. ¶ 39.

## III.    Applicable Law

Under Florida law, a restrictive covenant in the employment setting is valid if the employer can prove "(1) the existence of one or more legitimate business interests justifying the restrictive covenant; and (2) that the contractually specified restraint is reasonably necessary to protect the established interests of the employer." AutoNation, Inc. v. O'Brien, 347 F. Supp. 2d 1299, 1304 (S.D. Fla. 2004).  See also Thyssenkrupp Elevator Corp. v. Hubbard, No. 2:13-cv-202-FtM-29UAM, 2013 WL 5929132, *4 (M.D. Fla. Nov. 4, 2013); CreditMax Holdings LLC v. Kass, No. 11-81056-Civ Ryskamp/Vitunac, 2011 WL 13108061, *2 (S.D. Fla. Dec. 5, 2011); Fla. Stat. § 542.335(1)(b), (c).  Florida statute section 542.335 further provides that a "legitimate business interest" includes, but is not limited to

> [t]rade secrets, as defined . . . [by state statute]; [v]aluable confidential business or professional information that otherwise does not qualify as trade secrets; [s]ubstantial relationships with specific prospective or existing customers, patients, or clients; [c]ustomer, patient, or client goodwill associated with: [a]n ongoing business or professional practice, by way of trade name, trademark, service mark, or "trade dress"; [a] specific geographic location; or [a] specific marketing or trade area; [and] [e]xtraordinary or specialized training.

Fla. Stat. § 542.335(1)(b)(1)-(5).  See also White v. Mederi Caretenders Visiting Servs. of Se. Fla., LLC, 226 So. 3d 774, 782-83 (Fla. 2017); AutoNation, Inc., 347 F. Supp. 2d at 1304; Gould & Lamb, LLC v. D'Alusio, 949 So. 2d 1212, 1213-14 (Fla. 2d Dist. Ct. App. 2007).  The statute also directs that "[t]he violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement of a

restrictive covenant." Fla. Stat. § 542.335(1)(j). However, that presumption is rebuttable. See H&M Hearing Assoc., LLC v. Nobile, 950 So. 2d 501, 503 (Fla. 2d Dist. Ct. App. 2007).[7]

Additionally, Florida law provides that "[a]ny restrictive covenant not supported by a legitimate business interest is unlawful and is void and unenforceable." Fla. Stat. § 542.335(1)(b); see also GPS Indus., LLC v. Lewis, 691 F. Supp. 2d 1327, 1333 (M.D. Fla. 2010). And, a party seeking to challenge the validity of a covenant not to compete "has the burden of establishing that the contractually specified restraint is overbroad, overlong, or otherwise not reasonably necessary to protect the established legitimate business interest or interests." Fla. Stat. § 542.335(1)(c); Proudfoot Consulting Co. v. Gordon, 576 F.3d 1223, 1231 (11th Cir. 2009); Thyssenkrupp Elevator Corp., 2013 WL 5929132, at *4; GPS Indus., LLC, 691 F. Supp. 2d at 1333.

## IV.   Substantial Likelihood of Success

### A. Antecedent Breach of Contract Defense

In his Response, Haas argues that VOI breached the Employment Agreement prior to his alleged violation of the non-compete clause, and as such, VOI cannot enforce the non-compete agreement against him. See Response at 9-10. While under certain

---

[7] To the extent VOI contends that in determining whether to grant the injunctive relief, the Court should disregard any hardship suffered by Haas, the Court is unpersuaded. See Memo at 19. The Florida statute states that, "[i]n determining the enforceability of a restrictive covenant, a court: Shall not consider any individualized economic or other hardship that might be caused to the person against whom enforcement is sought." Fla. Stat. § 542.335(1)(g)(1); see also TransUnion Risk & Alternative Data Solutions, Inc., 625 F. App'x at 407. However, the Eleventh Circuit has noted that the provision in section 542.335(1)(g)(1) "governs the enforceability of restrictive covenants, not the enforcement of an already enforceable restrictive covenant," and therefore is not relevant when determining whether to grant or deny a preliminary injunction. TransUnion Risk, 625 F. App'x at 407 (emphasis in original). Hence, section 542.335(1)(g)(1) should only be considered for purposes of the validity of the covenant-not-to-compete, and not for whether an injunction should issue. Although TransUnion Risk is an unpublished opinion and therefore not binding, it is nevertheless "persuasive authority." United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000) (per curiam); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

circumstances, this could present a viable defense, see Direct Mail Holding, LLC v. Bush, No. 8:12-cv-145-T-30EAJ, 2012 WL 1344823, at *5-7 (M.D. Fla. Mar. 8, 2012), such circumstances do not exist here.  In the Employment Agreement, VOI and Haas agreed that if a controlling interest in VOI were sold "at anytime during the life of this employment agreement," then Haas would "receive payment in the amount of $100,000.00 on the closing date of such sale."  See Employment Agreement ¶ XI.  Because Fidelio Capital acquired VOI in May of 2020, Haas maintains he is entitled to $100,000.  See Response at 5.  According to Haas, at the time he was terminated on March 30, 2020, VOI "was already deep in negotiations to be acquired" such that "[t]he timing of Haas's termination reeks of bad faith, and in seeking to enforce the non-compete, [VOI] has kept the agreement 'alive' by arguing that the rights and obligations thereunder remain."  Id. at 10.  Because Haas did not start his employment with Arthrex until after the acquisition closed, Haas maintains that VOI breached the agreement first when it failed to pay him the $100,000.  Id.

However, Haas' argument entirely ignores the existence of the Separation Agreement which he signed on April 17, 2020.  Notably, although Haas maintains that at the time of his termination he was "aware that [VOI] was in the process of being sold to another company," see Haas Decl. ¶ 64, the Separation Agreement makes no mention of Haas' claim to a post-termination pay-out upon completion of the acquisition.  Moreover, as quoted in full above, the Separation Agreement provides that, except as to the restrictive covenants, "this Agreement fully supersedes any and all prior contracts or agreements between the Parties pertaining to compensation or severance."  See Separation Agreement ¶ 16 (emphasis added).  The Court notes that when confronted with this

language at the Hearing, counsel for Haas asserted for the first time that Haas was fraudulently induced to enter the Separation Agreement and that it lacks consideration. However, the Separation Agreement identifies over $21,000 in consideration on its face, id. ¶ 2, and a theory of fraudulent inducement is neither argued in the Response, nor supported by any evidence.  As such, these off-the-cuff arguments are insufficient to undermine the validity of the Separation Agreement at this stage in the proceedings.  In light of the terms of the Separation Agreement, VOI has shown that it has a substantial likelihood of defeating Haas' affirmative defense of an antecedent breach.

### B.  Legitimate Business Interest

As stated above, a valid covenant-not-to-compete must be supported by a "one or more legitimate business interests."  Fla. Stat. § 542.335(1)(b).  At the Hearing, VOI clarified that the legitimate business interests it contends justify the restrictive covenants in the Employment Agreement are its confidential business information and its substantial relationships with customers.[8]  Beginning with substantial customer relationships, Florida courts have held that a "substantial relationship is more likely to exist where there is active, on-going business being conducted; exclusivity; a customer who cannot be easily identified by other competitors in the industry; and an expectation of continued business." IDMWORKS, LLC v. Pophaly, 192 F. Supp. 3d 1335, 1340-41 (S.D. Fla. 2016).  In his Affidavit, Gendreau asserts that VOI expends a great deal of time, effort, and money to cultivate goodwill with the decision-making leaders of large customers and establish these customers as repeat buyers.  See Gendreau Aff. ¶¶ 6-10.  According to Gendreau, Haas

---

[8] At the Hearing, VOI stated that for purposes of the instant Motion it is not proceeding on a theory that its legitimate business interests include trade secrets or specialized training.  In addition, to the extent VOI asserts an interest in customer goodwill, it does so only in the context of its substantial business relationships and not as a separate, protectible interest.

"met with and communicated to many, if not most of, VOI's major and repeat customers," and he was "charged with communicating to and cultivating commercial relations between VOI and Key Opinion Leaders." Id. ¶¶ 28-29.  In Response, Haas contends that VOI's evidence is devoid of any specifics and too generalized to establish any substantial customer relationships under Florida law.  Haas points to the lack of any specifically identified customer with whom VOI had an exclusive relationship or an expectation of continued business.  Indeed, although Gendreau speaks of the importance of repeat buyers in the industry, he fails to explain in detail how this works in practice, who these buyers are, or the percentage of VOI's business that comes from repeat buyers.  See Thyssenkrupp Elevator Corp., 2013 WL 5929132, at *5 (stating that to establish an interest in substantial customer relationships the business "must show that it has substantial relationships with specific clients").  Nevertheless, the Court need not resolve at this time whether VOI has a substantial likelihood of success in showing a protectible interest in its substantial customer relationships because, as discussed below, VOI has sufficiently established the existence of confidential business information justifying a restrictive covenant.[9]

It is generally established in Florida that "information that is commonly known in the industry and not unique to the allegedly injured party is not confidential and is not entitled to protection." CreditMax Holdings, LLC, 2011 WL 13108061, at *3; see also GPS Indus., LLC, 691 F. Supp. 2d at 1335.  Also, the mere identity of clients or pricing terms "may not

---

[9] The Court also questions whether VOI's interest in protecting substantial customer relationships, to the extent one exists, would justify the broad competitor non-compete clause sought to be enforced here. See Proudfoot Consulting Co., 576 F.3d at 1233 n.9 (expressing doubt as to whether a broad prohibition against working for a competitor, regardless of which clients the former employee served, was reasonably necessary to protect former employer's client relationships).

be sufficient to justify a restrictive covenant," where the employer fails to show that this data derives "economic value from not being readily ascertainable by others who can obtain economic value from their disclosure." GPS Indus., LLC, 691 F. Supp. 2d at 1335; see also Gould & Lamb, LLC, 949 So. 2d at 1214 (employer's broad statements of concern to protect "marketing plans, product plans, business strategies, financial information, forecasts, and the like" insufficient to establish legitimate business interest); Proudfoot Consulting Co., 576 F.3d at 1234 n.11 (suggesting that mere identity of clients may not rise to the level of a legitimate business interest); Thyssenkrupp Elevator Corp., 2013 WL 5929132, at *5 (alleged "confidential information" that is readily accessible from other sources does not constitute a protectable legitimate business interest).

Conversely, business information which is not otherwise readily available to the public, or has been acquired or compiled through the industry of a party, can be deemed a protected legitimate business interest. See e.g., AutoNation, Inc., 347 F. Supp. 2d at 1305 (finding company's highly specialized information not otherwise publicly available, including Best Practices policies, Peer Performance Reports, and information disclosed at Monthly Operating Review Meetings, to be protectable legitimate business interests under a covenant not to compete); Open Magnetic Imaging, Inc. v. Nieves-Garcia, 826 So. 2d 415, 419 (Fla. 3d Dist. Ct. App. 2002) (holding that customer database, which contains customer idiosyncrasies, as well as information as to referral patterns, preferences, and insurance accepted, was a protected legitimate business interest); AutoNation, Inc. v. Maki, No. 03-18896 CACE(03), 2004 WL 1925479 (Fla. Cir. Ct. Aug. 25, 2004) (company's highly specialized information not otherwise publicly available, including Best Practices policies,

22

Peer Performance Reports, information disclosed at Monthly Operating Review Meetings, constituted protectable legitimate business interests under a covenant not to compete).

Here, VOI identifies the following categories of purportedly confidential business information in the Gendreau Affidavit:

a. The identities of VOI's customers, and their contact information;
b. The identities of VOI's referral sources, and their contact information;
c. The identities of those persons in the industry VOI identifies as Key Opinion Leaders;
d. The identities of VOI manufacturing and distribution partners and vendors;
e. VOI's information and educational modules auxiliary to its products;
f. The processes and methods VOI uses to create those modules;
g. The patterns of customer preference and need that underpin the design of those processes and methods;
h. Specific customer purchasing information;
i. Prices and payment terms
j. VOI's costs and margins; and
k. Marketing and sales strategy.

See Gendreau Aff. ¶ 17.  On the current record, the confidentiality of many of these items is disputed and the Court expresses some skepticism that VOI will be able to establish that all of these items constitute protectible confidential information to which Haas had access.  Nevertheless, for purposes of the instant Motion, the Court finds that VOI has established a substantial likelihood of success in proving that the following items constitute protectible confidential business information to which Haas had access while at VOI: referral sources, patterns of customer preferences and needs, specific customer purchasing information, VOI's costs and margins, and VOI's marketing and sales strategy. Accordingly, the Court addresses each of these categories below.

Turning first to VOI's referral sources, Gendreau maintains that VOI has devoted years of work and expense to develop a "network of customers and industry allies, professionals in the veterinary orthopedic industry" who refer new prospective customers

to VOI.  See Gendreau Aff. ¶ 16.  Gendreau maintains that the identities of these referral sources and their contact information is kept confidential and describes the measures used to maintain confidentiality.  Id. ¶¶ 17-18.  In his Response, Haas states only that he "did not take any customer lists or referral sources with me when leaving [VOI.]"  See Haas Decl. ¶ 33.  However, Haas does not deny that he knows the identity of VOI referral sources, nor does he deny that such information is confidential.  As VOI's referral sources constitute non-public information, specific to VOI, and acquired through its hard work and expense, the Court is satisfied that VOI has a legitimate business interest in maintaining its referral sources as confidential business information.

With respect to VOI's information regarding patterns of customer preferences and needs, as well as specific customer purchasing information, VOI presents evidence through the Gendreau Affidavit that VOI takes special measures to keep such information confidential and that Haas was entrusted with this information.  See Gendreau Aff. ¶¶ 17, 18, 32.  As explained above, Haas also had access to the Fishbowl database where such information was stored.  See Gendreau Decl. ¶¶ 13-14.  Significantly, unlike other categories of purportedly confidential information identified in the Gendreau Affidavit, Haas does not deny that VOI's data regarding customer preferences and purchasing history is confidential.  To the extent Haas addresses this category of information, he does so by asserting that he did not "engage in any day-to-day oversight of purchasing or ongoing sales," did not take any "purchasing data" with him when he left VOI, and "was not privy to any product development or product enhancement information while working" at VOI.  See Haas Decl. ¶¶ 21, 40, 44.  However, Haas does not directly or specifically deny that he had access to VOI's information regarding patterns of customer preferences or needs.

Likewise, while Haas contends he did not engage in "day-to-day oversight" of purchasing or "ongoing sales," he does not deny that he had knowledge of, or access to, specific customer purchasing information.   Although Haas maintains that he did not take purchasing data with him, this assertion does not undermine, and arguably supports, VOI's evidence that Haas had access to such information while at VOI.

On the current record, VOI also has established that Haas had access to confidential information pertaining to VOI's costs and margins.   As with the above information, Gendreau identifies such information as confidential, explains how VOI maintains the confidentiality of this information, and states that Haas had access to it through the Fishbowl database.  See Gendreau Aff. ¶¶ 17, 18, 28, 32; Gendreau Decl. ¶¶ 13-14.   In his Declaration, Haas does not deny that cost and margin information is confidential at VOI.  Instead, Haas maintains that because he did not engage in "any day-to-day oversight of purchasing or ongoing sales," he "did not have reason to have any knowledge as to the specific price a product sold to a particular customer, nor the margins related to those products."  See Haas Decl. ¶¶ 21-22.  Haas also asserts that he "was not privy to specific Plaintiff's [sic] margins or costs, and even if I had access to such information, I would have no use for it in my role at [Arthrex] because it is widely known and accepted that [Arthrex] prices its products differently, i.e. [Arthrex] does not attempt to undercut [VOI] on price."  See Haas Decl. ¶ 43 (emphasis added).   However, these carefully worded denials do not create an issue of fact regarding whether Haas actually knew or had access to VOI's confidential cost and margin information.  Haas' assertion that he had no "reason to have any knowledge," does not directly deny that he did have such knowledge, nor does it deny that he had access to such information.  Moreover, while

Haas maintains that he was not "privy" to such information, he immediately equivocates by acknowledging that he may have had access to such information. And indeed, Gendreau affirmatively maintains that Haas did have access to such information through the Fishbowl database. Accordingly, on the evidence presently before the Court, VOI has shown that during his employment Haas knew and had access to confidential cost and margin data.

Last, for purposes of the instant Motion, the Court is satisfied that Haas had access to confidential information regarding VOI's marketing strategy. Gendreau states that Haas was "was exposed to, through monthly sales team meetings, the proprietary strategies and market analyses of VOI as a commercial organization selling original products through proprietary means," as well as "data and telemetries providing feedback and what was working, what was driving sales." See Gendreau Aff. ¶ 33. In Response, Haas asserts that he "was not privy to market strategy information" and does not know what VOI's strategy is other than offering low prices and discounts. Id. ¶ 45. Haas also maintains that to the extent VOI asserts that he received such information in monthly sales meetings, he does "not recall being in attendance at any of the meetings where such information was discussed and, if it was, [he] certainly did not take any information from those meetings with [him]." Id. ¶ 46. In the Reply, VanHorssen avers that Haas was present at sales staff meetings where proprietary information about "customers, sales, pricing, product developments, [and] marketing initiatives" was discussed. See VanHorssen Decl. ¶ 9. Once again, Haas' carefully worded inability to recall, combined with an acknowledgement that he could have been present at meetings where confidential marketing information was

discussed, fails to rebut or otherwise create an issue of fact in the face of VOI's affirmative, unequivocal assertions that Haas did attend such meetings.

To the extent Haas argues that VOI's marketing strategy is not confidential, the Court is not persuaded.  Haas appears to contend that VOI's marketing strategy, to the extent he knows anything about it, is limited to offering prices and discounts.  See Haas Decl. ¶ 45.  And, Maddalone asserts that in a recent response to a group email, a marketing coordinator at VOI "replied all" with an email containing VOI's "fall marketing strategy."  See Maddalone Decl. ¶ 25, Ex. A.  Specifically, the information contained in the email is a list of advertisements VOI wishes to include in a September newsletter to members of what appears to be a trade organization.  See id.  The fact that VOI's advertised discounts are not confidential does little to undermine VOI's contention that its overall sales strategies are confidential or that it maintains other confidential marketing strategy information.  As explained in Gendreau's Declaration, VOI's market strategy has multiple elements, including "(a) educational content, (b) product purchase incentives, (c) in-house financing incentives, and (d) targeted relationship-building with Key Opinion Leaders and veterinary orthopedic researchers."  See Gendreau Decl. ¶ 15.  Notably, Haas' Declaration supports a finding that he is aware of VOI's strategy in designating certain individuals as "Key Opinion Leaders" in the industry.  See Gendreau Decl. ¶ 36.  Haas appears to contend that VOI has no protectible interest in the Key Opinion Leaders because they are "leaders in the industry" and "not specific" to VOI.  See Haas Decl. ¶ 36.  But he does not dispute that VOI endeavors to keep confidential the fact that VOI has designated a particular individual as a Key Opinion Leader for purposes of its own marketing strategy.  Regardless of whether these individuals purchase from, or consult

with, other sellers in the industry, the knowledge that VOI has identified a particular person to target as a "Key Opinion Leader" as part of a strategic decision to build a relationship with such person is non-public information, unique to VOI, which a competitor could use in an attempt to undermine VOI's marketing strategy.  Thus, the Court is satisfied that VOI is substantially likely to succeed in showing that Haas has knowledge of confidential marketing strategy information such as VOI's strategy for targeting Key Opinion Leaders.

In light of the foregoing, the Court finds that VOI has established the existence of a legitimate business interest in protecting certain confidential business information to which Haas had access.  Thus, the Court turns next to whether the restrictive covenants VOI seeks to enforce are reasonably necessary to protect these interests.

### C. Reasonably Necessary

In addition to establishing the existence of one or more legitimate business interests, VOI must establish that "the contractually specified restraint is reasonably necessary to protect the legitimate business interest or interests justifying the restriction." See Fla. Stat. § 542.335(c).  The restrictive covenant at issue here constitutes a broad prohibition on Haas' employment with any competitor in the industry, in any capacity, anywhere in the world, for two years.  See Employment Agreement ¶¶ V.A.7. & V.B.  VOI contends that this industry-wide, worldwide prohibition on competition is necessary to protect its legitimate business interests because if its "confidential business information were given to a competing company, that company could competitively change their product line, price structure, or marketing approach in a way designed to take sales away from VOI."  See Gendreau Aff. ¶ 22.  Gendreau explains that the competitor "would be able to neutralize VOI goodwill under the guise of simply offering a prospect their

company's changed or new product." Id.  On this record, the Court is satisfied that some degree of restriction on competition is warranted to protect VOI's confidential business information.  See Pitney Bowes Inc. v. Acevedo, No. 08-21808-CIV, 2008 WL 2940667, at *3 (S.D. Fla. July 28, 2008) (finding employment restrictions reasonably necessary in light of employee's role as a sales director for former employer and his "unfettered access" to former employer's "database and specific client information such as customers' purchasing patterns and expected future needs"); Proudfoot Consulting Co., 576 F.3d at 1234 ("when employee has access to confidential business information crucial to the success of an employer's business, that employer has a strong interest in enforcing a covenant not to compete").[10]

Nevertheless, the Court is not persuaded that a two-year, worldwide, industry-wide prohibition on competition is reasonably necessary under the facts of this case.[11]  While VOI maintains that Haas has not met his burden of demonstrating that the restraint is

_____

[10] In his Response, Haas argues that VOI fails to show the reasonable necessity of any restrictive covenant to protect its legitimate business interests and maintains that this case is akin to Nuvasive v. LeDuff, 2:19-cv-698-FtM-38NPM, ECF No. 37 (M.D. Fla. Nov. 13, 2019) (order denying preliminary injunctive relief where business had established legitimate business interests but not the necessity of the restrictive covenant sought to be enforced). See Response at 16.  However, because the analysis set forth in Nuvasive is limited and largely conclusory, the Court does not find it to be instructive in this case.  Moreover, under Florida law, if a contractually specified restraint is "not reasonably necessary to protect the legitimate business interest or interests," courts are instructed to "modify the restraint and grant only the relief reasonably necessary to protect such interest or interests." See Fla. Stat. § 542.335(1)(c); see also id. § 542.335(1)(h) ("A court shall construe a restrictive covenant in favor of providing reasonable protection to all legitimate business interests established by the person seeking enforcement.").  Thus, to the extent the contractual restrictions are broader than necessary to protect the legitimate interests at issue here, the Court finds it appropriate to limit the injunction to what is reasonably necessary rather than deny injunctive relief altogether.

[11] To the extent VOI proposes that the Court also enjoin Haas from disclosing any confidential information, the Court notes that, on this record, there is no evidence to suggest that Haas has taken any confidential information or otherwise threatened to disclose such information. Given that the Court will enjoin Haas from competing against VOI, the Court does not find it necessary to impose an additional non-disclosure injunction at this time.  However, Haas is cautioned that he is still subject to the terms of the restrictive covenants in the Employment Agreement.  The Court has not issued a final decision on the merits as to the enforceability of those restrictions and to the extent he violates that Agreement, he risks the entry of a judgment against him.

"overbroad, overlong, or otherwise not reasonably necessary," the Court notes that the burden shifts to Haas only <u>after</u> VOI has made a prima facie showing of reasonableness. <u>See</u> Fla. Stat. § 542.335(1)(c). And significantly, the two-year restraint at issue here is not entitled to a presumption of reasonableness. <u>See</u> Fla. Stat. § 542.335(1)(d)(1.)("[A] court shall presume reasonable in time any restraint 6 months or less in duration and shall presume unreasonable in time any restraint more than 2 years in duration."). Although VOI seeks a restraint the duration of which extends to the threshold of presumptive unreasonableness, VOI presents no <u>evidence</u> that a two-year restraint is necessary based on the nature of the confidential information at issue in this case or the way this particular industry operates. While VOI cites to other cases where Florida courts have found a two-year restraint to be reasonable, it fails to explain why the facts of <u>this</u> case support such a finding. Specifically, VOI presents no <u>evidence</u> demonstrating that the contents of the confidential business information will remain viable, relevant and valuable for a full two years. Nor is there evidence that Haas actually took any business records with him, rendering it unlikely that the information he "carries in his head" is capable of being remembered over the span of two full years. The Court declines to presume that two-years is reasonable without any evidence establishing the necessity of this lengthy restriction. Rather, on the current record and at this stage in the proceedings, the Court is satisfied that enjoining Haas from competing against VOI for one-year is sufficient but not greater than necessary to protect VOI's legitimate business interests.

Turning to the geographic scope of the non-compete, VOI seeks an injunction against Haas participating in the veterinary orthopedic products industry with a geographic scope including both "the continental United States and international markets." <u>See</u> Memo

at 16-17.  In <u>Auto Club Affiliates, Inc. v. Donahey</u>, 281 So. 2d 239 (Fla. 2d Dist. Ct. App. 1973) the court set forth a helpful analysis regarding the reasonableness of nationwide restrictions on covenants not to compete.[12]  The court stated that the conflicting interests of the employer and employee must be balanced in that "[a]n employee must not be permitted to deprive his employer of his business and the employer must not deprive his employee of a skill upon which he depends for his livelihood." <u>Id.</u> at 241.  As such, although "[a] nationwide restriction is not invalid per se," "the area in which competition is restricted must not be broader than is necessary to protect the employer's interests." <u>Id.</u>  Notably, where the legitimate business interest at issue is confidential and proprietary information, courts have found restrictive covenants which extend beyond the specific region where the employee worked on behalf of his former employer may be reasonably necessary to protect the former employer's interests.  <u>See Proudfoot Consulting Co.</u>, 576 F.3d at 1238-39 (collecting cases); <u>see also Autonation, Inc.</u>, 347 F. Supp. 2d at 1307-08 (finding a prohibition on working in "any geographic space in which [former employer] operates" reasonably necessary to protect confidential business information relevant to the markets in which it operates).

Here, the evidence establishes that through his work at trade shows and labs, Haas engaged with customers from across the United States, and also worked to develop VOI's business in Australia.  Given this evidence, it is reasonable to find that Haas has confidential information relevant to those markets.  However, other than broad generalities,

---

[12] Although the contract addressed in the <u>Auto Club</u> case was governed by Indiana law, the court appears to be applying general principles applicable to the reasonableness of covenants not to compete with respect to time and area.  <u>See Auto Club</u>, 281 So. 2d at 241 ("The law of Indiana appears to be in conformity with the general view that time and space limitations determine the reasonableness of such an agreement.").

VOI provides little in the way of specific evidence demonstrating how or why one could reasonably expect Haas to "carr[y] in his head" confidential information which could be used to unfairly compete with VOI in international markets other than Australia. While such a showing may be possible upon further development of the record, at this time, without any specific, supporting evidence of its necessity, VOI has not shown that the extraordinary relief of a non-compete injunction stretching across the globe is reasonably necessary to protect its interests. As such, the Court will limit the scope of the injunction to the continental United States and Australia.

In light of the foregoing, the Court is satisfied that VOI has shown that it is substantially likely to succeed in its breach of contract claim. VOI has presented sufficient evidence to support a finding that the restrictive covenants in the Employment and Separation Agreements, as modified in scope here, are enforceable under Florida law, and that by accepting employment with a direct competitor, Haas has breached those Agreements.[13]

## V.    Irreparable Harm

Ordinarily, to demonstrate irreparable harm, a party must show "that the injury cannot be undone through monetary remedies." Winmark Corp. v. Brenoby Sports, Inc., 32 F. Supp. 3d 1206, 1223 (M.D. Fla. 2014) (quoting Anago Franchising, Inc. v. C.H.M.I., Inc., No. 09-60713-cv, 2009 WL 5176548, at *11 (S.D. Fla. Dec. 21, 2009)). However, under Florida Law, "[t]he violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement of a restrictive

---

[13] As with the Court's other findings, the modifications to the restrictive covenants made here are based on the evidentiary record currently before the Court. Such findings are not dispositive of whether, on a more fully developed record, VOI will be able to establish that its broader and longer restrictive covenant is reasonably necessary to protect its legitimate business interests.

covenant." Fla. Stat. § 542.335(1)(j).  That presumption, of course, is rebuttable.  See H&M Hearing Assoc., LLC, 950 So. 2d at 503.  Because, as stated above, VOI has, for purposes of this Motion, established that its non-compete agreement with Haas is enforceable and that Haas' employment with Arthrex violates its terms, VOI is entitled to a presumption of irreparable harm.

Haas attempts to rebut the presumption of irreparable harm by arguing that VOI and Arthrex are not actually competitors.  See Response at 16-17.  However, the evidence establishes otherwise.  According to Gendreau, Arthrex is "a direct competitor of VOI, and strives to manufacture, distribute, and sell products to the veterinary orthopedic industry that directly compete with VOI products."  Id. ¶ 36.  In Response, Haas tries to minimize the degree to which VOI and Arthrex compete by characterizing VOI as an inferior, low-cost product targeting a different segment of the market.  However, it is undisputed that both companies sell TPLO products, the very same products that Haas sold while working at VOI.  And, although Haas did not have a particular "territory" while working at VOI, his new sales territory at Arthrex, identified as Tennessee, Kentucky, Ohio, Indiana, and Michigan, overlaps with the nationwide scope of the customers to whom he sold while working at VOI trade shows and workshops.  See Haas Decl. ¶¶ 8, 11; Maddalone Decl. ¶ 38.  As discussed at the Hearing, the Court is not convinced that Arthrex's contention that its products are superior products sold to high-end veterinarians, while VOI's products are "cheaper replicas of competitors' products" sold to "cost-conscious surgeons" establishes a lack of competition between these two sellers of veterinary orthopedic products.  See Haas Decl. ¶¶ 15, 56.[14]  Such a statement, rather than negate competition,

---

[14] Haas also argues that Arthrex cannot be considered a competitor of VOI because VOI did not specifically include Arthrex in the list of competitors set forth in the Non-Compete Agreement.  See Am.

reflects the competitive nature of the two companies' product lines.  Indeed, the threat of having a former VOI salesperson use VOI's confidential information to convince VOI customers to purchase from a competitor using that very depiction of VOI products as cheaper knock-offs is precisely the type of irreparable harm which VOI seeks to prevent through its non-compete agreement.

Moreover, Haas' contention that VOI is unharmed because it has not identified any "exclusive customer that it seeks to protect," nor has it "asserted that Haas has actually attempted to solicit such a customer or that the customer is at risk," is insufficient to rebut the presumption.  <u>See</u> Response at 17.  The purpose of Florida's rebuttable presumption of irreparable harm is to ensure that an employer, like VOI, does not have to wait until it has been harmed by the loss of a specific customer in order to obtain an injunction.  Indeed, such a showing would place VOI in a position of actually having to suffer damages that would be "difficult to measure with reasonable certainty," before obtaining an injunction to prevent such damages.  <u>Merrill Lynch, Pierce, Fenner & Smith v. Dunn</u>, 191 F. Supp. 2d 1346, 1354 (M.D. Fla. 2002); <u>see also</u> <u>New Horizons Computer Learning Ctr., Inc. v. Silicon Valley Training Partners, Inc.</u>, No. 2:02CV495FTM29SPC, 2003 WL 23654790, at *7 (M.D. Fla. Nov. 12, 2003) ("When the failure to grant injunctive relief creates the possibility of a permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong has been satisfied."); <u>Atomic Tattoos, LLC v. Morgan</u>, 45 So. 3d 63, 66 (Fla. 2d Dist. Ct. App. 2010) (injunction appropriate as calculating loss from breach of covenant-not-to-compete "would be nearly impossible to calculate, particularly with a continuing breach").

---

Compl., Ex. B.  However, the plain terms of the agreement provide that the Non-Compete Agreement includes but is "<u>not limited to</u>" the entities listed.  <u>Id.</u> (emphasis added).  Thus, this argument is not persuasive.

Gendreau asserts that Haas "carries in his head the 'keys to the VOI sales kingdom,' and his very presence at a competitor such as Arthrex immediately threatens the value and sustainability of VOI goodwill and proprietary innovations, systems, processes, information, and strategy." Id. ¶ 39.  While Haas insists that he has no use for the information, the sheer fact of his employment with a direct competitor, in a similar position selling overlapping products in overlapping markets, "endanger[s] the information that he received at" VOI. See Proudfoot Consulting Co., 576 F.3d at 1234-35.  And once VOI's confidential business information is revealed, this harm cannot be undone.  Haas' arguments to the contrary are simply insufficient to rebut the presumption of irreparable harm on this record.

## VI.    Balance of Harms

The Court must now examine whether "the threatened injury to [VOI] outweighs the harm an injunction may cause [Haas]."  Am. Red Cross, 143 F.3d at 1410.  VOI is threatened with the potential loss of its confidential business information which the record shows it has expended substantial time and resources developing.  See e.g., AutoNation, Inc., 347 F. Supp. 2d at 1308 (competitor's use of plaintiff's confidential business information "would provide an unfair advantage to the competitor's efforts to compete with" plaintiff); Medi-Weightloss Franchising USA, LLC v. Sadek, No. 8:09-cv-2421-T-24MAP, 2010 WL 1837767, at *7 (M.D. Fla. Mar. 11, 2010) (plaintiff's harm includes "competition with former franchisees and employees who agreed not to engage in competition, [and] loss of exclusivity and confidentiality of its proprietary and confidential information").  Conversely, Haas maintains that enforcement of the restrictive covenant will force him into unemployment in a job market made all the more challenging by the ongoing global pandemic.  See Response at 18.

"In the context of non-competition agreements . . . courts have held that enjoinment from something one has no right to is not a hardship." <u>TransUnion Risk & Alternative Data Solutions, Inc. v. MacLachlan</u>, No. 14-cv-81485, 2015 WL 12910652, at *3 (S.D. Fla. Oct. 29, 2015). Here, on the limited record before the Court, it appears that Haas "entered into valid agreements prohibiting the conduct [VOI] seeks to enjoin," <u>Merrill Lynch, Pierce, Fenner & Smith</u>, 191 F. Supp. 2d 1346 at 1354, but nonetheless wishes to violate those agreements. The Court is not persuaded that the harm occasioned by enforcing the terms of an agreement Haas willingly entered into outweighs the harm threatened by VOI's potential loss of its confidential business information. <u>See e.g.</u>, <u>7-Eleven, Inc. v. Kapoor Bros. Inc.</u>, 977 F. Supp. 2d 1211, 1227 (M.D. Fla. 2013) (where defendant's alleged harm arises from defendant's own violation of restrictive covenant, balance tips in favor of plaintiff); <u>Dunkin' Donuts Franchise Rest. LLC v. D & D Donuts, Inc.</u>, 566 F. Supp. 2d 1350, 1361-62 (M.D. Fla. 2008) (same). Although the Court is concerned with Haas' ability to support his family during this extraordinarily difficult moment in world history, the Court has endeavored to limit the scope of the injunction in a manner which allows Haas to continue his employment with Arthrex in some capacity. Thus, the Court finds that the balance of harms analysis weighs in favor of VOI.

## VII. Public Interest

The entry of an injunction in this case would serve the public's interest in the protection and enforcement of contractual rights. <u>See</u> <u>Telemundo Media, LLC v. Mintz</u>, 194 So. 3d 434, 436 (Fla. 3d Dist. Ct. App. 2016) ("Nor does an injunction disserve the public interest where, as here, there are contractual rights at issue and 'the public has a cognizable interest in the protection and enforcement of contractual rights.'" (quoting <u>Hilb</u>

Rogal & Hobbs of Fla., Inc. v. Grimmel, 48 So. 3d 957, 962 (Fla. 4th Dist. Ct. App. 2010)));

Moon v. Medical Technology Assocs., Inc., No. 8:13–cv–2782–EAK–EAJ, 2014 WL

1092291, at *3 (M.D. Fla. March 19, 2014) ("Public interest favors the protection and

enforcement of contractual rights...."). An injunction also serves the public interest in

protecting legitimate businesses from the disclosure of confidential information and unfair

competition. See Pharmerica, Inc. v. Arledge, No. 8:07-cv-486-T-26MAP, 2007 WL

865510, at *9 (M.D. Fla. Mar. 21, 2007) ("[A]n injunction against [defendant] is appropriate

. . . [because] it protects the advancement of honest business enterprises and the

economic well-being of the nation as a whole." (internal quotations omitted)); Se. Mech.

Servs., Inc. v. Brody, No. 8:08-CV-1151-T-30EAJ, 2008 WL 4613046, at *16 (M.D. Fla.

Oct. 15, 2008) ("[A] preliminary injunction would affirmatively serve the public interest by

protecting business from misappropriation of confidential information and resources.").

Accordingly, this factor also weighs in favor of VOI.

## VIII.    Bond

Rule 65(c), Federal Rules of Civil Procedure, and Florida statute section

542.335(1)(j), provide that a preliminary injunction should not issue "without the giving of

security by the applicant sufficient for payment of costs and damages as may be incurred

or suffered by any party to have been wrongfully enjoined." N. Am. Prods. Corp. v. Moore,

196 F. Supp. 2d. 1217, 1232 (M.D. Fla. 2002). Although VOI maintains that only a minimal

bond is necessary under the circumstances of this case, the Court is convinced that given

the potential harm this injunction poses to Haas' financial well-being, a substantial bond is

warranted. As such, the Court determines that VOI must file a surety bond in the amount

of one hundred fifty thousand dollars ($150,000), within five business days of the entry of

this Order.  Upon the filing of the bond, this preliminary injunction shall be effective, and shall continue in effect until March 30, 2021, unless earlier terminated by Order of this Court.

In conclusion, the Court finds that VOI has established the four prerequisites for the entry of a preliminary injunction.  Accordingly, it is

**ORDERED**:

1. Plaintiff's Motion for Temporary Restraining Order and for Preliminary Injunction (Doc. 7) is **GRANTED, in part, and DENIED, in part.**

   A. Plaintiff's Motion is **GRANTED** to the extent that the Court issues the preliminary injunction set forth below.

   B. In all other respects, Plaintiff's Motion is **DENIED**.

2. Within the time and geographic scope limitations set forth in paragraph 5, Defendant Matthew J. Haas is **ENJOINED** from: working for, with, or in the employ of any business engaged in the sale or distribution of veterinary orthopedic implant products, including Arthrex Vet Systems, a business unit of Arthrex, Inc., **EXCEPT** that Haas may work for such a business if his position is one wholly removed from the sale of such products or the solicitation of customers who purchase such products.

3. All others in active concert or participation with Haas, including Arthrex, Inc. dba Arthrex Vet Systems, who receive actual notice of this Order, are **ENJOINED** from facilitating, supporting, directing, or assisting Haas in doing, directly or indirectly, the above listed enjoined activities.

4. The scope of this Preliminary Injunction is limited to the following geographic region: the continental United States and Australia.  The Preliminary Injunction shall begin on the date Plaintiff posts bond and remain in effect until **March 30, 2021**, unless earlier terminated by Order of this Court or otherwise extinguished by the resolution of this litigation.

5. Plaintiff shall post good and sufficient security in the form of a surety bond with the Clerk of the Court in the amount of **ONE HUNDRED AND FIFTY THOUSAND DOLLARS ($150,000.00)** for the payment of such costs and damages as may be incurred or suffered should it later be determined that Defendant was wrongfully enjoined.

6. The requirements of this Order shall be **effective immediately upon the posting of the bond**.  In the event Plaintiff fails to comply with the posting of security with the Clerk as required by paragraph 5, or file a motion seeking an extension of time in which to do so, by **4:00 p.m., Tuesday, September 15, 2020**, the Court may vacate this Order in its entirety without further notice.

**DONE AND ORDERED** in Jacksonville, Florida, this 8th day of September, 2020.

**MARCIA MORALES HOWARD**
United States District Judge

lc11
Copies to:

Counsel of Record
Pro Se Parties